MATTHEW B. REISIG (NY Bar No. 4898094)
Email: reisigm@sec.gov
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-6429
Facsimile: (202) 772-9282

DANIEL O. BLAU
(Cal Bar. No. 305008)
Email: blaud@sec.gov
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3306
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 2:24-cv-07924 |
| PLAINTIFF, | **COMPLAINT** |
| v. | |
| COINW6, | **DEMAND FOR JURY TRIAL** |
| d/b/a CoinW6.com, 6hsh.com, dmd567.com, bybit.cc, and cglobalw.com, | |
| DEFENDANT. | |

Plaintiff, Securities and Exchange Commission (the "Commission") alleges as follows:

1

## JURISDICTION AND VENUE

1.      The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

2.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78(e), and 78aa].

3.      Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce or the mails in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

4.      Venue for this action is proper in the Central District of California under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business that form the basis for the violations alleged in this Complaint occurred within the Central District of California. Several investors were residents of this District at all relevant times, the Defendant sent text messages and communications which included material misrepresentations into this District to the investors, and the Defendant offered its crypto asset products as securities to persons residing in this District including investors.

## SUMMARY OF ALLEGATIONS

5.      This case concerns a romance investment scam perpetrated by a web of individuals and entities through a fake online crypto asset platform operating under the names coinW6.com, 6hsh.com, dmd567.com, bybit.cc, and cglobalw.com (collectively "CoinW6" or the "Defendant") that defrauded U.S. investors by contacting them through social media platforms, gaining their trust, and then manipulating them into transferring their crypto assets and funds before effectively disappearing.

6.     From at least July 2022 through at least December 2023, individuals who were either controlled by CoinW6 or who controlled CoinW6 themselves ("Scheme Participants") engaged in this coordinated scheme to defraud at least 11 investors out of more than approximately $2.2 million.

7.     The Scheme Participants contacted prospective investors through social media platforms, such as LinkedIn and Instagram, and then pursued romantic relationships with them over the messaging platform, WhatsApp. After developing online romantic relationships with prospective investors, the Scheme Participants introduced the investors to so-called "cryptocurrency," claiming that they had earned hundreds of thousands of dollars through crypto asset products that CoinW6 offered and sold on its websites through an online crypto trading platform ("CoinW6 Platform"). The CoinW6 Platform promised two to three percent passive returns *per day* from crypto asset staking, mining, or yield farming products that the Defendant purportedly operated. In fact, the CoinW6 Platform and its products were entirely fictitious.

8.     The Scheme Participants instructed investors on how to purchase crypto assets, such as Tether (USDT) and Ethereum (ETH), and invest those assets on the CoinW6 Platform. After investing, the Defendant misrepresented to investors that they were earning massive daily returns while, in reality, the Defendant had already misappropriated their crypto assets. After a few months of operating the fraud on a website, and as investors tried to withdraw funds from their accounts, the Defendant removed content from the website and continued the fraud under a new web domain.

9.     The Defendant's purported crypto asset staking, mining, and yield farming products were investment contracts and thus securities offered and sold in unregistered transactions in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

10.     By directly or indirectly making materially false statements to investors to offer and sell investment contracts to investors, and/or engaging in deceptive acts in connection with the offer, purchase, and sale of these investment contracts, the

Defendant violated the antifraud provisions of Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5].

11.    In this action, the Commission seeks permanent injunctions prohibiting the Defendant from violating the securities laws by engaging in the kind of conduct alleged herein, as well as permanently enjoining the Defendant from directly or indirectly participating in the issuance, purchase, offer or sale of any security. The Commission also seeks an order requiring the Defendant to remove all pages of its websites and in its place post a copy of the Commission's Complaint, disgorge its ill-gotten gains plus prejudgment interest, and impose a civil penalty.

## **DEFENDANT**

12.    **CoinW6** is an unincorporated business with no known address and no known officers or directors. Individuals in the United Arab Emirates registered the CoinW6.com web domain on November 11, 2022, through a web domain registrar located in Singapore. CoinW6 referred to itself as CoinW on its platform, which is the name of an unrelated, actual crypto asset exchange based in Singapore.

13.    As described further herein, CoinW6 did business and operated through a number of predecessor and successor websites, including 6hsh.com, dmd567.com, bybit.cc, and cglobalw.com. Individuals registered 6hsh.com on June 10, 2022, with a web domain registrar located in the People's Republic of China. Individuals registered dmd567.com and bybit.cc with the same web domain registrar as CoinW6.com in Singapore on November 23, 2022, and January 30, 2023, respectively. Individuals in the People's Republic of China registered cglobalw.com on June 9, 2023, with a web domain registrar located in the United States. Regardless of web domain or address, all iterations of CoinW6's Platform were nearly identical in appearance and offered similar purported crypto asset products. As described further herein, regardless of the web domain name or address, CoinW6 Scheme Participants contacted investors through similar means and operated in a similar fashion. Upon information and belief,

CoinW6.com, 6hsh.com, dmd567.com, bybit.cc, and cglobalw.com were controlled by and part of a single enterprise.

<u>FACTS</u>

**I.    COINW6's SCHEME TO DEFRAUD**

14.    From at least July 2022 through at least December 2023, CoinW6, by and through the Scheme Participants, perpetrated a coordinated scheme to defraud at least 11 investors out of more than approximately $2.2 million.

**A.    CoinW6 Scheme Participants Develop Romantic Relationships with Potential Investors**

15.    CoinW6's fraudulent scheme began with Scheme Participants purporting to be young, attractive professionals contacting prospective investors across the United States through social media platforms such as LinkedIn and Instagram. Often Scheme Participants would claim to have mistakenly stumbled upon a prospective investor's social media profile.

16.    For example, as shown in the screenshots below, on September 8, 2022, a Scheme Participant using the pseudonym "Margaret," contacted a prospective investor residing in California on Instagram claiming to have "accidentally brushed" a post from the prospective investor and then sought to move the conversation to WhatsApp.




17.    Upon establishing initial rapport, the Scheme Participants then pursued romantic relationships with prospective investors over the messaging platform, WhatsApp. The Scheme Participants created and used fictional online personas, purporting to be managers of businesses like salons in New York or Los Angeles. As shown below, the Scheme Participants depicted themselves as young, beautiful, and rich on social media and in photos sent to investors. The Scheme Participants often told investors that they were frustrated with dating and disappointed with their prior relationships.[1]



18.    For example, a Scheme Participant using the pseudonym "Viviana," contacted a prospective investor residing in California, "Investor A," in early September 2022 and told him, over WhatsApp, that she had moved to New York City from Australia after a divorce and the death of her only child. Viviana also told Investor A that she owned and managed a salon with 25 employees in the city.

_____

[1] The SEC has anonymized or obscured certain names, identifying information, or images to protect the identities of alleged victims of this fraud as well as unaffiliated individuals whose names, images, or likenesses may have been misappropriated by the Defendant or Scheme Participants to perpetrate the scheme.

19.    In another instance in or around September 2022, a Scheme Participant using the alias "Arlene," contacted a prospective investor residing in Missouri, "Investor B," over LinkedIn purporting to run a business in New York City after moving there from China.

20.    After establishing initial faux rapport with investors over social media, Scheme Participants sought to develop online romantic relationships with prospective investors using WhatsApp. The Scheme Participants would discuss travel, hobbies, prior relationships, and share photographs. Often after a month of conversations, with very little mention of "cryptocurrency," a romantic relationship developed in which the investor had formed trust in the Scheme Participant, believing their story to be true and their romantic interest in them to be genuine.

[10/10/22, 5:38:52 PM] Viviana Australia: I look forward to you sharing your story with me. I really want to talk for 3 days and 3 nights and share all my things with you, but you don't have the time. I also wish you could tell me everything about you
[10/10/22, 5:46:53 PM] Investor A: Ok I will slow down!! I will share but 3 days and 3 nights may not be enough !! Haha will we chat Friday? You tell me if and when you are free! I will be home ALONE!…. Unless she changes plans!!! Always a possibility!!!

**B.    Scheme Participants Induce Investors to Purchase Crypto Assets**

21.    After Scheme Participants had fostered romantic relationships with prospective investors, they introduced investors to so-called "cryptocurrency," and recommended investment into crypto staking, mining, and yield farming products that the Defendant offered on the CoinW6 Platform. These products, as further described below, offered different daily returns on invested funds for different periods of time, such as 3, 7, 15, or 30 days. To invest in CoinW6's products, the Scheme Participants directed investors to use U.S. dollars to purchase crypto assets such as Tether (USDT), which is a crypto asset purportedly pegged to the U.S. dollar, or Ethereum (ETH), on U.S.-based crypto platforms. From there, they showed investors, using screenshots over WhatsApp, how to open self-custodial crypto wallets, and then move their USDT or ETH crypto assets to those self-custodial wallets. The Scheme Participants then showed the investors how to open an account on the purported CoinW6 Platform and how to

deposit their USDT or ETH crypto assets into those accounts. After the investors' accounts on the CoinW6 Platform were purportedly credited with crypto assets, the Scheme Participants walked the investors through investing in CoinW6's purported crypto asset staking, mining, and yield farming products. The investors selected the product almost always based on the Scheme Participants' recommendation.

22.     In the case of Investor A, for example, on October 10, 2022, after having developed a romantic relationship over a month, Viviana recommended investing in crypto assets and introduced Investor A to CoinW6 and its crypto asset products.

23.     Specifically, Viviana directed Investor A to 6.hsh.com where Investor A was presented with what appeared to be an authentic interface which purported to offer trading in dozens of crypto assets, and which mimicked the features and functionality of a legitimate trading platform as reflected in the below screenshots Viviana sent to Investor A over WhatsApp. Viviana then walked Investor A through setting up an account with CoinW6 on the 6hsh.com interface. The screenshots were of the 6hsh.com web domain and its successor web domain, coinw6.com, which were nearly identical.

 

24.     In reality, the Commission's investigation revealed no evidence that a bona fide crypto asset trading platform existed and no evidence that any transactions were executed on the CoinW6 Platform.

25.     With Viviana's guidance, Investor A started investing, first purchasing $1,000 worth of USDT on a U.S.-based crypto asset platform and transferring those assets to a self-custodial crypto wallet Viviana showed Investor A how to create. Sharing screenshots of the wallet and the account Investor A set up on the CoinW6 Platform with Viviana's assistance, Viviana walked the investor through transferring the crypto assets to a crypto address CoinW6 represented as tied to Investor A's CoinW6 account for the purpose of investing in the Defendant's crypto asset products. On or about October 27, 2022, Viviana recommended and again through the use of screenshots, showed Investor A how to purchase CoinW6's 3-day crypto asset staking product using the 1,000 USDT.

  

26.     Similarly for Investor B, Arlene directed him to open an account on the CoinW6 Platform and, in addition to investing in CoinW6's crypto asset staking and mining products, she directed trades in crypto asset pairs on the platform to generate thousands of dollars in returns. Arlene, using screenshots sent over WhatsApp, showed Investor B how to deposit crypto assets, trade crypto asset pairs, and how to purchase CoinW6's products. On December 12, 2022, Investor B invested $5,000 in a purported crypto asset mining product that Arlene had recommended and that was advertised on

the CoinW6 Platform.

**C.    Scheme Participants Pressure Investors to Increase Their Investment On the CoinW6 Platform**

27.    As the romantic relationships continued and Investors were led to believe their investments were generating significant returns by the CoinW6 Platform which reflected purported profits at several multiples of the principal invested, the Scheme Participants then urged investors to find more money to invest – even recommending that investors withdraw funds from retirement accounts or borrow money from friends and family to generate larger returns on CoinW6. Several of the Scheme Participants also led investors to believe they had deposited funds into the investors' CoinW6 accounts to qualify for promotions, pay fees, or to co-invest.

28.    For example, on or about November 1, 2022, Viviana told Investor A that CoinW6's staking program generates daily returns of 2.2 to 2.6 percent, which she claimed had amounted to income of $150 in just 3 days on Investor A's initial investment of $1,000. Viviana then assisted Investor A in using the principal and purported proceeds to invest in CoinW6's 7-day crypto asset mining product. From November 1 through November 6, Viviana consistently asked Investor A to deposit more crypto assets to invest into CoinW6's products, recommending a balance of at least $50,000.

29.    After seeing what appeared to be generous returns reflected on the CoinW6 Platform on the 7-day investment in the crypto asset mining pool, Investor A agreed to deposit more funds with the assistance of Viviana, bringing his total principal – excluding any returns – to about 9,500 USDT. On or about November 11, 2022, Viviana recommended that Investor A invest in CoinW6's 30-day crypto asset mining product, which offered daily returns of 3.2 to 3.6 percent, and told the investor that an investment of $100,000 would result in profits of $3,540 per day. On or about November 29, 2022, Viviana and the CoinW6 Platform represented to Investor A that he had made a return of approximately 6,238 USDT on his principal of 9,500 USDT in a month.

30.     Scheme Participants further lured investors into investing more funds with the promise of even greater returns through promotional investment opportunities. Beginning on or about November 13, 2022, for example, Viviana informed Investor A that CoinW6 was offering an event reward "due to the arrival of Christmas." Specifically, Viviana claimed that if Investor A invested $41,00 more with CoinW6 to bring his balance to $50,000, he would be entitled to a "bonus" of over $18,000, equivalent to a 37 percent return. Over the course of following weeks, Viviana repeatedly pressured Investor A to bring his total investment up to $50,000.

31.     When Investor A expressed hesitation in investing more funds, Viviana appealed to their relationship stating, "I just want you to progress with me and increase your money in the hope that you can follow in my footsteps and make me feel like someone I care about is doing what I love with me." Viviana also raised that she had recommended that Investor A increase his principal on three different occasions, and that his failure to do so suggested that he did not care about her, stating "[Y]ou don't respect my suggestions and take my advice. It shows that you don't want to progress with me." After extensive romantic conversations over several days to resolve Viviana's accusation that Investor A did not care about her, he committed to raising his investment principal at CoinW6 to $50,000 on or about December 12, 2022.

32.     Scheme Participants also attempted to build trust with investors by claiming to deposit funds on their behalf in order to meet the balance requirements for promotions. For example, on or about December 16, 2022, a WhatsApp message purportedly from CoinW6 "Customer Service" informed Investor A that he needed an additional $2,059 fee to qualify for the $50,000 promotion to collect $17,777 in rewards. Viviana offered to pay the fee into Investor A's account and asked for a screenshot of his purported address at CoinW6.

33.     Despite telling Investor A that she had transferred crypto assets worth $2,300 to Investor A, in reality, no such assets were transferred – the Ethereum blockchain showed no deposits into the investor's account in the hour before or after she

claimed to have sent the crypto assets.[2] Despite not having sent the crypto assets, the
CoinW6 Platform falsely reflected a 2,300 USDT credit in Investor A's account.
Investor A promised to pay Viviana back, which she said he could do by treating her to a
delicious dinner and a bouquet of roses, a common technique used in romance
investment scams to create the vision of a future together.

```
[12/16/22, 1:40:54 PM] Viviana Australia: I transferred 2059 to your account for
you, because I have USDT in my wallet and I can transfer it directly for you
[12/16/22, 1:42:02 PM] Viviana Australia: I don't need your check, honey, I just
hope that when we meet, you treat me to a delicious dinner and send me a bouquet of
roses, I will be very happy 😊😊
[12/16/22, 2:06:35 PM] Investor A: I will treat you royally!!! I would love your
address in my so I can send you roses and "stuff "!!!! I just hope that we can meet
when she is gone so that we are in peace all night!! Where've!! Thanks sweetheart!!!
You are amazing!! Did you collect your rewards??
```

34.    On or about December 17, 2022, the Defendant represented on the CoinW6
Platform to Investor A that he had qualified for the bonus and that his account balance
now represented 118,021 USDT. As Investor A had not deposited more than 50,000
USDT, his account on the CoinW6 Platform now reflected a purported a return of more
than 100 percent.

35.    On or about December 22, 2022, Viviana also told Investor A that she had
sent 200,000 USDT to the address purportedly tied to the investor's account at CoinW6
to co-invest with him. The Ethereum blockchain reflects no such transfer.

36.    This tactic, in which the Scheme Participants told investors that they had
deposited crypto assets into the investor's account to co-invest or pay fees, was used
with other investors. Once again, the Ethereum blockchain reflects that these co-
investments or payments never occurred.

37.    Based on Viviana's statements and information displayed on the CoinW6
Platform, Investor A would ultimately deposit crypto assets worth approximately

---

[2] The term "blockchain" typically refers to a distributed digital ledger that is used to
record transactions across many computers, secured by cryptographic techniques so that
the record cannot be altered retroactively without the alteration of all subsequent blocks
and the consensus of the network.

$495,600 with the Defendant during the Relevant Period, of which at least $97,000 was deposited to invest in CoinW6's crypto asset products. Investor A pulled some of these invested funds from his retirement account. By February 1, 2023, his account on the CoinW6 Platform reflected a balance of approximately 925,662 USDT as shown in the screenshot below. The account balance reflects profits of 626,362 USDT – after deducting the funds credited to the account from transfers Viviana failed to send (203,200 USDT) as outlined in paragraphs 33 and 35. These profits represented purported profits of 6.5 times Investor's A principal of $97,000 over approximately four months.



38.    Investor B was induced to invest further into CoinW6 by Scheme Participants using similar deceptive acts. On or about December 9, 2022, Arlene told Investor B that without depositing $8,000 to his account that day, he would miss out on $40,000 of profits from CoinW6's products and recommended a balance of at least $50,000 for an upcoming trade on December 15, 2022.

39.    During December 2022, Arlene also applied romantic pressure to have Investor B deposit an additional $50,000. Arlene explained that he could make a million dollars in profits. Initially, Investor B deposited $5,000 on December 12, 2022, which as stated previously, Arlene directed him to invest in CoinW6's crypto asset mining product.

40.    While pressuring Investor B to invest further, Arlene also talked about building a house and starting a life together soon with Investor B.

```
12/16/22, 9:45 PM - Arlene: Withdrawal of more than 1 million will be a bit slow.
Tomorrow is the weekend. You can apply for withdrawal on Monday.
12/16/22, 9:45 PM - Arlene: ☺
12/16/22, 9:45 PM - Investor B: Ok Honey...that is fine...
12/16/22, 9:45 PM - Investor B: You make me so Happy!!!
12/16/22, 9:45 PM - Arlene: Is it enough to buy a house
12/16/22, 9:45 PM - Investor B: We can build a dream home!!!!
12/16/22, 9:46 PM - Investor B: Our dream home!!!!!
12/16/22, 9:46 PM - Arlene: ☺

12/16/22, 9:47 PM - Arlene: This is our first step, and I will make us better and
better in the future.
12/16/22, 9:47 PM - Investor B: We can travel and have another home anywhere!!!
12/16/22, 9:47 PM - Investor B: Ok?
12/16/22, 9:47 PM - Investor B: China first though right!
12/16/22, 9:48 PM - Arlene: Yes, honey
12/16/22, 9:48 PM - Arlene: China has lifted the blockade. We can go to China
together.
```

41.    In total during the Relevant Period, Investor B had deposited nearly
$131,000 worth of USDT into his account on the CoinW6 Platform, which included
some funds he had borrowed from family, investing all of it through at least January 15,
2023. His purported returns as reflected on the CoinW6 Platform collectively reached a
balance of approximately one million USDT or about 6.6 times his invested principal
over approximately just four months.

**D.    While Scheme Participants Lulled Investors to Invest on the CoinW6
Platform, CoinW6 Was Misappropriating Their Funds**

42.    As described above, Scheme Participants directed Investors to transfer their
crypto assets to addresses purportedly connected to the CoinW6 Platform. Unbeknownst
to investors, within hours after they transferred their crypto assets to this address, the
Defendant transferred the crypto assets to an offshore crypto asset "tumbler". A crypto
asset tumbler or "mixer platform" is a service that mixes potentially identifiable or
"tainted" crypto assets with other crypto assets, so as to obscure the trail between the
asset's original source and its destination. This is usually done by pooling together
crypto assets from multiple inputs for a large and random period of time, and then
spitting them back out to destination addresses. Since the purpose of using a tumbler is
to create anonymity, persons often use tumblers to launder crypto assets that have been
misappropriated.

43.    After the Defendant transferred investors' crypto assets to the tumbler, it
misappropriated these assets for its own benefit because investors were not able to make

withdrawals on their accounts with the CoinW6 Platform and lost all the crypto assets they had invested.

44.     As described above, although the crypto assets were obscured and diverted to other crypto wallet addresses, the Defendant, through displays on the CoinW6 Platform, misrepresented to investors that their funds were safely custodied in the investors' accounts with the Defendant. The accounts for the investors, which investors could access online as instructed by the Scheme Participants, falsely reflected the amount of crypto assets the investors believed they had deposited. For example, Investor A transferred 29,230 in USDT to his account with the CoinW6 Platform on or about December 6, 2022. Although the Defendant had diverted the crypto assets, the CoinW6 Platform reflected a balance of 39,341 USDT, which included a prior balance of approximately 9,835 USDT that had also been diverted to a tumbler. The screenshots below show the prior balance, the Defendant recording the deposit transaction, and the investor's balance after the deposit.

  

45.     The Defendant and the Scheme Participants misrepresented to the investors that the investors had, according to their account balances on the Defendant's websites, made hundreds of thousands of dollars from the additional investments. For example, the

Defendant misrepresented that Investor A and Investor B had earned approximately
619,000 USDT and 869,000 USDT, respectively, through the platform's products in less
than six months on principal of approximately $97,000 and $131,000, respectively. The
Defendant, however, never retained the crypto assets in an account for the investor's
benefit and the purported investment returns reflected on the CoinW6 Platform were
fake. For instance, in one screenshot of Investor A's account on December 22, 2022, the
Defendant represented that his account had a balance of 135,798 USDT and that he had
earned cumulative income of 30,226 in USDT, or approximately 22.3 percent, through
its staking product with all of the income but for 2,277 in USDT being earned over the
prior 35 days.

> **E.**    **CoinW6 Blocks Investors From Withdrawing Their Funds With False
> Claims of Money Laundering Asset Freezes, Taxes, and Fees**

46.    Eventually, investors stopped investing additional funds – often because
they did not have any more funds to invest – or tried to withdraw the funds reflected in
their accounts on the CoinW6 Platform, and as described below, were unable to do so. In
response, the Defendant's "Customer Service" would routinely contact investors through
WhatsApp claiming that their crypto assets were frozen because the U.S. Department of
Treasury's Financial Crimes Enforcement Network ("FinCEN") had detected money
laundering, they owed taxes on the assets in their account, or they owed fees to crypto
asset miners.

47.    To withdraw the funds, Customer Service told investors that they needed to
deposit additional crypto assets to be held in escrow pending the outcome of FinCEN's
investigation or to pay the applicable taxes or fees. If the crypto assets were not
deposited, Customer Service claimed that CoinW6 would assess penalties of one percent
of the investor's account value per day. These statements were all false. The false
statements pressured investors to deposit additional crypto assets, and continued to
intimidate investors from withdrawing their principal and the returns they had
supposedly earned from the Defendant's investment products.

48.     For example, after Investor A had exhausted the amount of funds he had available to invest a month prior, Customer Service told him on or about January 26, 2023, as shown below, that he owed $187,000 of taxes on profits made using the Defendant's products. At this time, the Defendant represented that the investor's account

  

balance was approximately 816,000 USDT, as shown above, which resulted in profits of 5.3 times the investor's principal over a 3-month period – October 2022 to January 2023. Viviana explained and walked Investor A through making the necessary payment, which Investor A transferred to an address Customer Service sent him over WhatsApp.

49.     The Scheme Participants reassured the investors that they had deposited additional crypto assets in the past to successfully withdraw their earnings on the CoinW6 Platform or pressured the investor by putting them under duress to make the additional payments. The Scheme Participants, in several instances, told investors that they could not be together without withdrawing the crypto assets earned from investing in CoinW6's products. The Scheme Participants also cited to promises from the investors to gift money for the Scheme Participants' fake businesses that were supposedly in dire financial condition, or even tried to blackmail the investors. A few investors paid additional funds but were unable to withdraw any funds.

50.     For example, prior to paying the purported taxes of $187,000, Viviana told Investor A that he would be able to withdraw all his funds after the tax payment, which would also enable him to repay her the 202,300 USDT she claimed to have sent him to co-invest and qualify him for a CoinW6 promotion.

51.     Arlene – like Viviana – also reassured Investor B by giving assurances that a miner's fee was legitimate and her fault for not warning him to not have reinvested all the ETH in CoinW6's products, thereby rendering those crypto assets unavailable to pay the miner's fee until the product's duration ended (i.e. 3, 7, 15, or 30 days depending on the product): "I forgot to remind you! Honey, it's all my fault. . . . I should have reminded you earlier to leave some ETH in your wallet as a miner's fee instead of putting them all in coinw." Arlene continued representing that the transaction to pay the miner's fee was safe, and continued to discuss their future together.

52.     After paying the purported taxes to the Defendant as described in paragraph 48, Investor A attempted to withdraw his funds on or about January 31, 2023. On or about February 2, 2023, the Defendant rejected the withdrawal and sent a notice purportedly from FinCEN to Investor A, as depicted below, which informed him that his account had been suspended because of suspected money laundering. According to the



notice, to un-suspend the account, Investor A would need to transfer approximately 256,000 USDT as a security deposit.

53.    Investor A initially believed that the notice was legitimate and caused by Viviana's deposits of 202,300 USDT. Viviana knew she never transferred any actual crypto assets to Investor A's account and hence knew that the reflected amounts in the investor's account at CoinW6 were fictitious. Viviana, therefore, made these fake transfers and communicated them to the Defendant to assist in creating a pretext for denying Investor A's attempt to withdraw funds and devise another means through which she could try to pressure the investor into transferring more crypto assets to the Defendant to be misappropriated.

54.    To add additional pressure for Investor A to pay the security deposit, Viviana represented that she never had any issues ultimately withdrawing her funds from CoinW6 and that the FinCEN inquiry was indeed serious and legitimate. She said to Investor A, "Don't worry, what we do is safe and formal. I have invested longer than you, and I have never encountered problems like yours in withdrawing money before." Viviana had also told Investor A that she had a very rich uncle who specialized in crypto assets, and that she had learned from him. Several other investors described the Scheme Participants also telling them that they had such uncles too. Viviana told Investor A that her purported uncle recommended paying the security deposit, saying "Uncle just told me that money laundering accidents in financial investment are very serious now. . . . Uncle recommends that you complete the verification process, otherwise your account will be frozen, which will also affect your investment credit."

55.    Because Investor A was unconvinced that additional funds would enable him to withdrawal his funds from CoinW6, Viviana started to tell him that it was urgent that she get her 203,200 USDT back as soon as possible because her salon needed the funds to pay her suppliers.

56.    After Investor A refused to send additional funds, Viviana resorted to blackmail, as shown in the WhatsApp messages at the top of the next page.

[2/9/23, 10:07:33 AM] Viviana Australia: This is my last step. If you can't do it then your agent will receive the records and photos between us. It will be your wife tomorrow and your daughter the day after tomorrow. You will receive a court summons next Monday. I'm going to book a flight to ██████ on Tuesday and bring my lawyer to your house to talk to your family. I will send the first email to your agent at 8pm New York time. hope you give me a reply before 8 o'clock

[2/9/23, 10:33:14 AM] Viviana Australia: ok, I see, so let's see! In a few days your photos and chat discipline will appear on Instagram and Twitter, and then appear in the newspapers in ██████

[2/9/23, 10:39:53 AM] Viviana Australia: Just wait for the court summons! I'm coming to ██████ next week with my lawyer and I know your home address and I'm going to come straight to your house and talk to your family and let your friends and family know you're a gangster and want to lick my p███, also look at my breasts. At that time your job will be lost too, I don't know what your colleagues in the ██████ will think of you, they will think you are a beast and a pervert




57.      Similarly for Investor B, after paying the mining fee as described in paragraph 51, CoinW6 informed him on December 30, 2022, that he also owed a further $16,000 as a handling fee on his withdrawal. Arlene did not resort to blackmail, but like Viviana, she continued to discuss a future together with Investor B, led him to believe that she was in financial trouble and in need of money from the withdraw as she had co-invested with him, and told him to prove that he loved her: "If you really love me, I think you should find a way to get the money out. If you can't don't say you love me."

**F.      The Defendant Continued The Fraud Through Successor Websites**

58.      After a few months of operating the fraud on a website and as investors started to try to withdraw funds from their accounts and online blogs would flag the web domain as a scam, the Defendant would take down the content from the website and restart the fraud under a new web domain. For investors who had yet to complain or

attempt to withdraw funds, the Defendant would send them a notice that its products, like its crypto asset mining pool, were undergoing maintenance upgrades. As a part of this process, the Defendant would share the new web domain and instruct the investor to use it to gain access to the investor's account and continuing investing with CoinW6.

59.   For example, Viviana initially directed Investor A to the CoinW6 Platform in October 2022 through the web domain 6hsh.com. Later in December 2022, Viviana began directing Investor A to access the CoinW6 Platform through the web domain coinw6.com.

60.   Likewise, an investor residing in Minnesota ("Investor C") contacted Customer Service through WhatsApp in November 2022 concerning a lack of account access. Customer Service told Investor C that the mining pool was undergoing a maintenance upgrade. On or about November 23, 2028, Customer Service informed Investor C that his account and the platform's crypto asset mining product could now be accessed through coinw6.com. Investor C's account had initially been at 6hsh.com.

61.   The web domains coinw6.com, dmd567.com, and bybit.cc were all registered by persons with the same email address. Persons used the email address zouyao.nee@gmail.com to register the web domains dmd567.com and bybit.cc. Although persons used the email peteraops@gmail to register coinw6.com, the recovery email listed for that account was vintaue.nee@gmail.com which, in turn, had a recovery email of zouyao.nee@gmail.com – the same address used to register dmd567.com and bybit.cc.

## II.   COINW6's PURPORTED INVESTMENT PRODUCTS WERE FICTITIOUS

62.   CoinW6's crypto asset staking product, as presented on the website, offered investors daily income of two to three percent. Crypto asset staking is a process whereby one "stakes" (or locks) the "native" token of a particular blockchain in order to earn the opportunity to participate on the "validation" mechanism, typically for "proof of stake" blockchains in exchange for earning rewards. The Defendant – not the investor – chose

what crypto assets to stake and transferred the purported income from its crypto asset staking product to the investor. The investors' sole involvement in the investment was selecting how long the investors wanted their crypto assets invested in CoinW6's purported crypto asset staking product.

63.    The Defendant, through its websites and the Scheme Participants, misrepresented to investors that CoinW6's crypto asset staking product existed and was providing returns to investors of two to three percent per day. For example, as described in paragraph 28, the Defendant and Viviana had represented to Investor A that he had earned $150 on an investment of 1,000 USDT into CoinW6's 3-day crypto asset staking product. When Investor A made his election to invest in the product, the address purportedly tied to the CoinW6 Platform did nothing; instead, his deposited funds were diverted hours later to a tumbler. Neither Investor A's principal nor supposed investment gains were returned to Investor A.

64.    CoinW6's crypto asset mining product, as presented on the website, offered investors daily income of two to three percent. In crypto asset mining pools, investors invest in a collection of crypto asset miners who combine their computational resources over a network to increase their chances to mine blocks and earn crypto asset rewards from proof of work blockchains. The Defendant – not the investor – chose which purported crypto asset mining pools to invest in and transferred the purported income to the investor. The investors' sole involvement in the investments was selecting how long the investors wanted their crypto assets invested in CoinW6's crypto asset mining product.

65.    The Defendant, through its websites and the Scheme Participants, misrepresented to investors that CoinW6's crypto asset mining product existed and was providing returns to investors of two to three percent per day. For example, as outlined in paragraph 29, the Defendant and Viviana had represented to Investor A that he had earned $6,238 on an investment of 9,500 USDT into CoinW6's crypto asset mining product in a month. Again, when Investor A made his election to invest in the product,

the address purportedly tied to the CoinW6 Platform did nothing; instead, his deposited funds were diverted hours later to a tumbler.

66.     CoinW6's crypto asset yield farming product, as presented on the website, offered investors daily income of two to three percent. In crypto asset yield farming, investors lock their crypto assets in smart contracts called liquidity pools on so-called decentralized crypto asset trading platforms to provide liquidity for various token pairs that trade in that liquidity pool. Investors who lock their crypto assets into liquidity pools can earn portions of fees charged or other rewards the platforms. The Defendant – not the investor – chose which liquidity pools to invest and transferred the purported income to the investor. The investors' sole involvement in the investment was selecting how long they wanted their crypto assets invested in CoinW6's crypto asset yield farming product.

67.     The Defendant, through its websites and the Scheme Participants, misrepresented to investors that CoinW6's crypto asset yield farming product existed and was providing returns to investors of two to three percent per day. There is no evidence that CoinW6 maintained or invested in any actual liquidity pools.

68.     Reasonable investors would have considered it material to their decision to invest in the Defendant's crypto asset staking, mining, and yield farming products that the products did not exist and hence were not generating any income for investors.

69.     The Scheme Participants misrepresented to investors that they had earned hundreds of thousands of dollars in profits from the Defendant's products. The Scheme Participants also misrepresented to investors that they were co-investing in the Defendant's products. For example, on December 6, 2022, after Investor A had deposited and invested 50,000 USDT – but prior to depositing and investing at least an additional 100,000 USDT – Viviana represented that she had invested $350,000 with the Defendant, earned $250,000, and planned to invest an additional $550,000. She also later represented that she had earned $1 million in rewards through CoinW6 promotions.

70.     Reasonable investors would have considered it material to their decision to

invest in the Defendant's products that the Scheme Participants – acting with, for, or controlling the Defendant – had not earned hundreds of thousands of dollars in profits and were not co-investing in the Defendant's products.

71.    The Defendant misrepresented to investors on its websites that its platform was affiliated with CoinW and/or Coinbase, which are existing crypto asset trading platforms. The Defendant displayed on its websites a Whitepaper of Coinbase, holding it out to be Defendant's Whitepaper. A Whitepaper is a document that explains a crypto project's objectives, potential, and technical and economic factors. Reasonable investors would have considered it material to their decision to invest in the Defendant's products that the Defendant was not affiliated with CoinW or Coinbase and that the Whitepaper displayed on Defendant's websites was, in fact, not Defendant's Whitepaper, but the Whitepaper of Coinbase.

## III.    COINW6'S PURPORTED INVESTMENT PRODUCTS WERE OFFERED AND SOLD AS SECURITIES

72.    As described above, including, but not limited to, in paragraphs 25, 26, 29, 37, and 41, investors invested money in the form of crypto assets – usually USDT – in the Defendant's non-existent crypto asset products on the CoinW6 Platform, which included crypto asset staking, crypto asset mining, and crypto asset yield farming.

73.    As described above, including, but not limited to, in paragraph 69, investors were investing in a common enterprise by co-investing or pooling their crypto assets with other persons in the Defendant's crypto asset products. The investors, including Investor A and Investor B, had each invested in the Defendant's crypto asset mining product. When making a deposit with CoinW6, in many instances the Defendant directed investors to transfer their assets to the same crypto address, thereby comingling and pooling crypto assets. Viviana and Arlene also claimed to have contributed funds to co-invest with these investors and had told them that they already had made hundreds of thousands of dollars investing with the Defendant. CoinW6 published rates of return for each of its crypto asset products on the CoinW6 Platform. Investors potential purported

profits or loss rose or fell together in proportion to their investment depending on the profitability of CoinW6's purported crypto asset products. Moreover, investors' potential for profits depended entirely on CoinW6's ability to operate and maintain the CoinW6 Platform as well manage its purported crypto asset products.

74.    As described above, including, but not limited to, in paragraphs 62-67, investors in the Defendant's crypto asset-products had an expectation of profits derived from the efforts of the Defendant. The Defendant's crypto asset products offered investors daily, passive income of two to three percent, which was reflected for each product on the CoinW6 Platform prior to investment, as shown in the images at the top of the next page. The Defendant – not the investor – chose which crypto assets to stake, into which crypto mining pool to invest, or into which liquidity pool to invest (yield farming), and transferred the purported income to the investor from these products. The investor's sole decision was for how long they wanted their crypto assets invested in CoinW6's products. As a result, investors potential for returns were dependent CoinW6's ability to make their crypto asset products profitable.



## IV.    COINW6 ACTED WITH SCIENTER

75.    As described above, including but not limited to, in paragraphs 44, 63, and

65, the Defendant had transferred the investors' crypto assets to a tumbler and misappropriated the funds as investors were unable to withdraw their investments and lost all their crypto assets. Yet, as described in paragraphs 28, 29, 37, 41, 44, and 45, the Defendant represented to investors that crypto assets were in an account for each investor's benefit and were being invested in CoinW6's crypto asset products. The Defendant, however, had misappropriated the investors' crypto assets prior to the investors selecting which product to invest. As a result, the Defendant knew or was reckless in not knowing that its representations concerning the investors' account balances and profits reflected in their accounts on the CoinW6 Platform were fictitious and untrue.

76.    As described above, including but not limited to, in paragraphs 48, 51, and 52, the Defendant, acting through the guise of Customer Service, represented to investors that FinCEN had frozen account balances, that taxes were due on their accounts, or that investors owed miner fees. As FinCEN does not have authority to freeze assets or block funds transfers – which it states clearly in an alert on its website at fincen.gov – the Defendant knew or was reckless in not knowing that its representations concerning FinCEN were false. Similarly, since the Defendant could not make tax payments because it did not collect tax identification numbers of the investors, and since the Defendant had not used investor's funds to invest in any crypto asset mining pools, the Defendant knew or was reckless in not knowing that it representations about taxes or miner fees being owed were false.

77.    As described above, including but not limited to, in paragraphs 33 and 35, the Scheme Participants told investors that they had transferred crypto assets into the investors' accounts to co-invest or pay fees. A review of the Ethereum blockchain for the purported crypto addresses of the investors on the CoinW6 Platform shows that the Scheme Participants like Viviana never made these transfers. Despite the transfers not occurring, the Defendant credited the investors' accounts for these transfers, misrepresenting to investors that the deposits had been made. As the transfers had not

occurred, the Defendant had to have been aware of the Scheme Participants' conversations with the investors so the CoinW6 Platform would reflect a deposit in the proper amount. As such, the Defendant knew or was reckless in not knowing that the Scheme Participants were making misrepresentations to the investors about having deposited crypto assets into their accounts with the CoinW6 Platform and knew or was reckless in not knowing that those deposits never occurred.

## FIRST CAUSE OF ACTION

### Violation of Sections 5(a) and 5(c) of the Securities Act

### [15 U.S.C. §§ 77e(a), 77e(c)]

78. The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1-11, 21-41, and 58-74, above.

79. Section 5(a) of the Securities Act provides that unless a registration statement is in effect as to a security, it shall be unlawful any person, directly or directly, (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

80. Section 5(c) of the Securities Act provides that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

81. No registration statement had been filed or was in effect for any of the securities offered and sold by the Defendant and no exemption applied.

82.    The Defendant, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

83.    By reason of the foregoing, the Defendant violated, and unless enjoined will again violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## SECOND CAUSE OF ACTION

### Violation of Section 17(a) of the Securities Act
### [15 U.S.C. §§ 77q(a)]

84.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 77, above.

85.    By engaging in the conduct described above, the Defendant, in the offer or sale of securities, and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material facts of by omitting to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the buyer.

86.    By reason of the foregoing, The Defendant, directly or indirectly violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CAUSE OF ACTION

### Violation of Section 10(b) of the Securities Exchange Act [15 U.S.C. § 78j(b)]
### and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

87.    The Commission realleges and incorporates by reference the allegations contained in Paragraphs 1 through 77, above.

88.    The Defendant, by engaging in the conduct described above, directly or indirectly, by the use of means or instrumentalities of interstate commerce or use of the

28

mails, in connection with the purchase or sale of securities, with scienter, (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business that operated or would operate as a fraud and deceit upon other persons.

89.    By reason of the foregoing, the Defendant violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### **I.**

Finding that the Defendant committed the violations of the federal securities laws as alleged in this Complaint;

### **II.**

In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from:

a. violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)];

b. violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

c. violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, enjoining the Defendant from directly or indirectly participating in the issuance, purchase, offer, or sale of any security, including, but not limited to, through any entity, affiliate or person owned or controlled by CoinW6 or acting for or with CoinW6.

### IV.

Issue an order requiring the Defendant to remove all pages of its websites and in its place post a copy of the Commission's Complaint.

### V.

Ordering the Defendant to disgorge all ill-gotten gains obtained as a result of the acts or courses of conduct alleged in this Complaint, together with prejudgment interest thereon, pursuant to Section 21(d)(3), (d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)].

### VI.

Ordering the Defendant to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VII.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Granting such other and further relief as this Court may determine to be just and necessary.

1

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, the Commission demands trial by jury.

Dated: September 17, 2024             /s/ Daniel O. Blau
                                        Daniel O. Blau
                                        Matthew B. Reisig
                                        Attorneys for Plaintiff
                                        Securities and Exchange
                                        Commission